Thomson, J.
On the 19th day of October, 1889, The Grand Mesa Land and Cattle Company of Colorado executed a trust deed, whereby it conveyed to E. L. Kellogg, as trustee, certain real estate to secure the payment of its two promissory notes, made on the same day, for $5,382.05 and $3,487.55, respectively, and *317 payable to tbe order of Sam G. Gill three months after date. The trustee was empowered, in case of default in the payment of the notes, to sell the land at public auction to the highest bidder, having first given twenty days’ notice of the sale, and to execute a conveyance of the premises to the purchaser, applying the purchase money upon the notes after deducting the expenses of the sale, and rendering the excess, if any, to the land and cattle company. The trust deed was immediately placed on record. Before the 31st day of January, 1891, the company, by payments made upon the notes, reduced the amount of the indebtedness which they evidenced to $5,000. On the last mentioned day, Sam G. Gill, the payee, sold and transferred the notes to Francis E. Talcott. On the 20th day of April, 1892, E. L. Kellogg executed to the cattle company a deed of release of the real estate conveyed by the trust deed. The deed of release recited as its consideration, the full payment of the notes secured by the trust deed; it also recited that it was executed at the request of Sam G. Gill, the payee. It conveyed the title held by the trustee to the company. As a, matter of fact, the notes were not paid. On the, 24th day of May, 1892, the Grand Mesa company executed a mortgage of the same land to Thomas Lamb, to secure the payment to him, one year from that date, of $15,000 which he had loaned the company. After the maturity of the debt to him, but at what precise time we are not advised, Lamb instituted proceedings for the foreclosure of his mortgage. The result was a decree in his favor, in pursuance of which the land was sold, himself being the purchaser. Afterwards, but when, we do not know, Lamb sold and conveyed the land to The Delta County Land and Cattle Company, a corporation. In October, 1893, the plaintiff was informed of the fact, *318 and record,' of the release. The last payment on the • notes — which was-a payment merely of interest due. —was received by Mr. Talcott in April, 1892. This suit to cancel the deed of release executed by Kellogg, and foreclose the trust deed securing the notes, was brought by Mr. Talcott on the 26th day of June, 1896. Kellogg, Lamb, The Grand Mesa Land- and' Cattle Company of Colorado, and The Delta County Land and Cattle Company, were made parties defendant.
The complaint averred that Lamb, with full knowledge that the land conveyed by the trust deed had been released without payment of the money secured upon it, and with intent to defraud the plaintiff, procured the foreclosure of his mortgage, took the title, and, for the purpose of making it appear that the land had passed to an innocent purchaser,' conveyed it, without any consideration, to The Delta County Land and Cattle Company, upon which, at the time it received its deed, full knowledge of all the facts was charged.
When the plaintiff had introduced his evidence, the Delta company moved for a nonsuit. The motion was denied, and the company declining to offer any evidence in its own behalf, judgment was entered cancelling the deed of release, and ordering a fores closure of the trust deed to Kellogg. From this judgment The Delta County Land and Cattle Company has appealed.
In the complaint, the plaintiff’s right to relief against the act of Kellogg in releasing the land, is based on the fraudulent practices of Lamb, and the fraudulent acquiescence of the Delta company in his conduct. A decree is sought subjecting and subordinating the title held by that company to the lien of the trust deed to Kellogg, and the sole ground of the plaintiff’s claim to such decree, as set forth in his *319 complaint, is that the Delta company acquired that title with full knowledge that it was procured by fraud, and for fraudulent purposes. I cannot discover in the evidence that Lamb was guilty of the conduct charged against him. It appears that a considerable time prior to the execution of the mortgage to him, he knew of the existence of the trust deed to Kellogg, and knew that the notes had been transferred to the plaintiff; but I am unable to find that when he secured the debt owing to him, he knew or suspected that Kellogg’s release did not speak the truth. But conceding that upon the question of Lamb’s good faith, the evidence might afford room for a difference of opinion, there was nothing presented to subject the conduct of the Delta company to the slightest suspicion. That it knew anything beyond what the records disclosed, nowhere appears. Upon the plaintiff’s own theory of his case, as outlined in his complaint, he is not entitled to relief, and the judgment below should be reversed. But other questions are pressed upon us for decision, and in-view of their importance, I deem it well to consider them. These questions are now presented for the first time to this court, and I am unable to find that they have ever been passed upon' by the supreme court.
In a number of cases, we have held deeds of release, executed by trustees without payment of the money secured, and without authority from the holder of the debt, to be invalid even as against purchasers who had no actual knowledge of the facts. These cases seem to be relied upon with considerable confidence by the plaintiff; and they will receive attention later. First, however, it will be in order to outline the features of the case before us.
The Grand Mesa Land and Cattle Company by its trust deed of October 19, 1889, conveyed to Kel *320 logg the legal title to the land. He was invested by the deed with power in ease of default in the payment of the debt, to make public sale of the land and execute a deed to the purchaser: He had no power except that conferred by the deed; and his conveyance to the purchaser at a sale, made in accordance with the requirements of the trust deed, was the only conveyance which that instrument authorized him to make. But he held the legal title, and that title he might vest in another by ordinary deed of conveyance, without the execution of the power, and without special authority from any source.—Stephens v. Clay, 17 Colo. 489.
When the debt which a trust deed secures is fully paid, the power of the trustee is extinguished, and the owner of the equity is entitled to a reconveyance of the legal estate. The trustee’s deed to a stranger would simply invest the latter with the title the former had. The owner of the equity and the owner of the secured debt would be equally unaffected by it. But a release to the owner of the equity would unite both titles in him. In case the debt has been paid, no question can arise upon the deed of release; but if the debt has not been paid the release is fraudulent. It is no release so far as the owner of the equity is concerned; but his relation to the instrument does not determine the status of an innocent purchaser from him.
It is provided by our recording act that all deeds or conveyances of, or affecting title to, real estate, or any interest therein, may be recorded in the office of the recorder of the county wherein the real estate is situate, and from and after their filing for record, and not before, they shall take effect as to subsequent bona fide purchasers and incumbrancers not having notice thereof.—1 Mils’ Ann. Stats., sec. 446.
*321 A deed of release is a deed affecting title to real estate within the meaning of the foregoing provision. It conveys a title; and when it is recorded, its effect, as to subsequent purchasers, is the same as that of any other recorded conveyance. A purchaser of real estate is bound to know what the records disclose concerning the title; and if they indicate the existence of some outside condition by which it may be affected, he is bound to investigate; and he is charged with knowledge of the facts to which the investigation would lead. But if, upon their face, the records are complete, and show that the title is good, in the' absence of information to the contrary from any other source, he may safely rely upon them. —King v. Ackroyd, 28 Colo. 488, 66 Pac. 906; Porter v. McNabney, 77 Ill. 235; Ogle v. Turpin, 102 Ill. 148; Howard v. Ross, 5 Ill. App. 456; Perkins v. Adams, 16 Colo. App. 96, 63 Pac. 792.
In Bank v. Miner, 9 Colo. App. 361, the recorded release showed upon its face that it was executed at the request, not of the holder of the debt secured, but of a party who had, apparently, no right to make, the request. This fact we held sufficient to put a subsequent incumbrancer upon inquiry. In Kenney v. Bank, 12 Colo. App. 24, the facts disclosed by the record were that the trustee advertised and sold the land conveyed by the trust deed some seven months before the note which the deed secured was due. The payee of the note — The Colorado Securities Company —purchased the land and received a deed, from which afterwards it caused its name to he erased, and the name of a stranger substituted as grantee. The deed recited a consideration of twenty-five dollars. The land was worth over $12,000. This stranger then made his promissory note to The Colorado Securities Company for $4,000, and secured it by trust deed of the land. The note was sold to Kenney. The origi *322 nal note was sold long before its maturity to tbe bank, and tbe foreclosure of tbe trust deed securing it was made without tbe consent or knowledge of tbe bank. Our judgment was that Kenney, tbe purchaser of tbe second paper, was bound to take notice that tbe foreclosure of tbe first deed of trust was undertaken before tbe maturity of tbe note it secured, and that land worth twelve thousand dollars was sold for twenty-five dollars; and that, having notice of these facts, be was bound at bis peril, before purchasing tbe second note, to ascertain by outside inquiry, that tbe sale was legitimate, and untainted by fraud. In Barker v. Scudder, 15 Colo. App. 69, 61 Pac. 197, William Gorringe executed a trust deed to Alonzo Rice, as trustee, conveying to him certain lots in tbe city of Denver to secure tbe payment of bis promissory note to Mrs. Scudder for $1,500, dated December 29, and due one year after date. After-wards, Gorringe borrowed $2,000 more from Mrs. Scudder, made bis note to her for tbe amount, dated April 1, 1891, due one year after date, and secured it by another trust deed of tbe same property to Rice. Two months afterwards, Gorringe applied to Mrs. Harker for a loan of $2,000, offering to secure it upon the same lots. Mrs. Harker’s agent, in examining tbe title, discovered tbe two trust deeds to Rice, and she declined to make tbe loan unless some portion of tbe property should be released from tbe lien of those deeds. Thereupon Rice, without tbe knowledge of Mrs. Scudder, and without tbe payment of any of tbe money secured to her, executed to Gorringe a deed releasing four of tbe lots from tbe lien of her two trust deeds, reciting that a portion of both notes bad been paid. Thereupon Mrs. Harker loaned tbe two thousand dollars to Gorringe, taking bis note for tbe amount, and, to secure its payment, a trust deed of tbe'four lots released by Rice. Subsequently, Mrs. *323 Seudder, having discovered that the lots had been released, brought suit to annul the release and reinstate her trust deeds as first liens upon the property. We affirmed the judgment below annulling the release and reinstating the deeds of trust. We held that the fact that the notes were not due, and the further fact that the deed arbitrarily released a portion of the property from the lien of each trust deed, were sufficient to put Mrs. Harker on inquiry. Wilson, J., delivered the opinion of the court, and inasmuch as that opinion is made the subject of considerable comment, I quote from it as follows: ‘ ‘ Considering the ease purely upon equitable grounds, Mrs. Harker was not an innocént incumbrancer. She knew from the records, or should have known, that the sole power with which Rice, as trustee, was invested, was to sell the property in case of default by Gorringe in payment of the principal of the notes when due, or of the interest, according to its terms. Under the provisions of the instrument, Rice acquired no power whatever, either express or implied, either by the terms of the trust deed or by operation of law, to execute a release deed before the maturity of the debt. Much less did he have any authority to release a part of the property, from the operation of the deeds of trust. These were powers which he could exercise only by the express authority of Mrs. Seudder, the owner and holder of the notes, and also of the deeds of trust. This was amply sufficient to have put Mrs. Harker upon her guard. She knew that the notes were executed to Mrs. Seudder, and it was her duty, in order to have protected herself, to have made some investigation or inquiry of Mrs. Seudder, in order to have ascertained whether this power, which was absolutely essential and necessary in order to validate the deed of release, had been given by her. This she did not *324 do, but relied solely -upon tbe recitals in tbe release deed. ’ ’
In that opinion we reiterated wbat we have frequently said before, and what the supreme court has strongly expressed in Improvement Co. v. Whitehead, 25 Colo. 358, namely, that the powers of a trustee depend entirely upon the terms of the instrument appointing him, and no power is conferred unless expressed in the writing. We also said that the authority to execute a release deed is necessarily incident to, and dependent upon, the power vested by the trust deed; that what would destroy or defeat the power to sell, would create the right to release, and that it is only after the power is extinguished by payment that it is possible for the trustee to reconvey the title discharged of the incumbrance. We also approved an expression in the opinion in Bank v. Miner, supra, that without authority from the party for whose benefit the trust deed was given, the act of the trustee in releasing it was void. Every utterance of a court must be interpreted by the facts to which it is applied. Under the facts of Harker v. Scudder, it was not possible for the trustee to reconvey the title discharged of the incumbrance, and under the facts of Bank v. Miner, the act of the trustee in releasing the land without authority from the party for whose benefit the trust deed was given, was . void. However, as an abstract proposition, the truth of the statement that a release deed executed without payment of the money secured, or without the request of the owner of the debt, is of no effect, may safely be affirmed. But the question of the right of Mr. Kellogg to release the land in controversy here, or of the effect of his deed upon the title, is not the question to be now determined. The question before us is whether, under the provisions of our recording act, when the record shows a complete and regular chain *325 of title, a purchaser without any knowledge of the title, except what the record imparts, will he protected in his reliance upon the record.
In each of the cases I have reviewed, the record disclosed some circumstance calculated to excite suspicion, and which demanded inquiry outside of the record; and in each case the necessity of such inquiry, to warrant the proposed purchase or incumbrance, was emphasized in the opinion. But in the'case at bar, there was nothing on the face of the record to indicate an imperfection in the title. The debt was past due, the release recited its payment, and persons proposing to invest in the property had the right to presume that, being overdue, it was paid. There is a legal presumption that parties perform their contracts. Upon the record Kellogg appeared to have the proper authority to execute the release. The presumption was that he had such authority, and the record itself did not, nor did it point to anything which did, indicate that a purchaser might not safely rely on the presumption. It has never been held by the supreme court, or by this court, that a person who is not chargeable with knowledge of a defect, and who finds a clear and perfect title upon the record, purchases, nevertheless, at his peril; and such is not the law.
The remaining case to which reference is made— Barstow v. Stone, 10 Col. App. 396—is not in point. The only question there was whether a successor in trust could execute a valid release, when'no contingency had arisen upon' which, by the terms of the trust deed, the title held by the trustee might become vested in him. We held that, having no title, he could convey none; but we declined to pass upon the question of superiority of equity, because it was not in the case..
If not-directly, at least, by very strong implica *326 tion, our supreme court has held that where the records disclose nothing to impeach the release, a purchaser for value, without notice that the instrument was unauthorized, and without notice or knowledge of anything which made it his duty to inquire into the truth of its recitals, will he protected in his purchase. The following were the facts in the case of Appelman v. Gara, 22 Colo. 397: Shugart executed a trust deed to Griswold to secure the payment to Gara of a note for $1,200. Shugart sold and conveyed his equity to Lack, Lack conveyed to McIntyre, McIntyre to Hoffman, and Hoffman to Griswold, the trustee. "Without payment of the note, and without authority from its holder, Griswold executed and placed on record a release deed to Shugart which recited that the note had been paid. Griswold then executed a trust deed of the property to McAdams, as trustee, to secure the payment to Appelman of $1,400. Gara brought suit against Appelman, Griswold and others to set aside the release, and establish the priority of the lien of his own trust deed. The court below awarded him the relief he sought, and in affirming its judgment, the supreme court spoke as follows :
“From the foregoing statement it will be seen that the trust deed to Griswold, given to secure the payment of the note of $1,200 to Gara, constituted a prior lien upon the property, and the execution of the release deed by Griswold to Shugart, without the payment of the note or the express authority of the holder, was an unwarranted éxercise of power on his part, and was ineffectual to destroy Gara’s lien as between him and the grantor, and subsequent purchasers with notice of such abuse of power. The only question, therefore, to be determined is whether Appelman had such notice, or its equivalent; by being put upon inquiry by anything contained upqn the re *327 cord of the title to the lot. That he did not have actual notice may be conceded, but that he had before him what was equivalent, namely constructive notice from the record, admits of no doubt. The original trust deed, of which he was bound to take notice, disclosed a contract by which the debt thereby secured was not due at the time its release was attempted. And by sundry mesne conveyances in the line of his title he was notified that the equity in the lot was vested in Griswold, the trustee, subject to this trust deed, and held by him subject to this security at the time the release was executed and recorded; that the release to Shugart, who at the time had no interest in the property, was in effect a release to himself. Under this condition of the title, if the trustee’s power was not extinguished, it is evident that its exercise was a gross violation of his trust. * * * With notice, therefore, of the conveyances through • whieh Griswold became vested with . the equity in the lot, and of the release of the trust deed by him while such owner, and before the maturity of the note secured thereby, appellant was apprised of facts sufficient to cast a suspicion upon the bona fides of the transaction, and put him upon inquiry whether the plaintiff’s note had in fact been paid; and he cannot, after ignoring these facts, and dealing directly with the unfaithful trustee in relation to the trust’ property, invoke the doctrine that courts of equity extend to innocent purchasers without notice. ’ ’
The foregoing language is hardly susceptible of an interpretation in harmony with the theory of plaintiff’s counsel. Upon that theory, the statement "that the release was ineffectual to destroy Gara’s lien as between him and the grantor, and subsequent purchasers with notice of the abuse of power, is meaningless, because, if the release was an absolute nullity, it would be immaterial whether purchasers *328 had notice or not; and, in saying that the only question to be determined was whether Appelman was chargeable with notice, and denying his right, with the facts he knew, or ought to have known, to invoke the doctrine that courts of equity extend to innocent purchasers, the court involved itself in singular confusion, if, notwithstanding there is nothing upon the the record, or within the knowledge of a purchaser, to excite a suspicion of irregularity, he must, at his peril, ascertain whether the recitals of the release are true. According to counsel’s contention, whether Appelman had notice, instead of being the only question, was not a question at all; and the reference to the doctrine which courts of equity apply to innocent purchasers was idle talk. If there can be no innocent purchaser under a fraudulent release, the court could have disposed of the case in a few words by simply saying so; and it is not supposable that with a direct, easy and effectual solution before it of the question involved, it went out of its way to find a subterfuge on which to rest its decision.
Upon the evidence, as it is ’presented in this record, I think the deed of Lamb to The Delta Land and Cattle Company vested a good title in the latter, and that the court erred in cancelling the deed of release.
Let the judgment be reversed. Reversed.
Wilson, P. J., concurs.